# Constitutionality of Legislation Withdrawing Supreme Court Jurisdiction to Consider Cases Relating to Voluntary Prayer

Proposed legislation withdrawing jurisdiction from the Supreme Court to consider cases relating to voluntary prayer in public schools and public buildings raises difficult and unsettled constitutional questions under the separation of powers doctrine. While Congress possesses some power under the Exceptions Clause of Article III of the Constitution to regulate the appellate jurisdiction of the Supreme Court, it may not interfere with the core functions of the Supreme Court as an independent and equal branch in our system of government.

The records of the Constitutional Convention, as well as the structure of the system of government adopted by that Convention, establish that the Exceptions Clause was not intended to allow Congress to intrude upon the Supreme Court's core functions. There is no basis in Supreme Court precedent, or in long accepted historical practice, for reaching a contrary conclusion.

Whether a given exception to Supreme Court jurisdiction intrudes upon its core functions depends upon a number of factors, such as whether the exception covers constitutional or nonconstitutional questions, the extent to which the subject is one which by its nature requires uniformity or permits diversity among the different states and different parts of the country, the extent to which Supreme Court review is necessary to ensure the supremacy of federal law, and whether other forums or remedies have been left in place so that the intrusion can properly be characterized as an exception.

May 6, 1982

THE CHAIRMAN OF THE COMMITTEE ON THE JUDICIARY
    UNITED STATES SENATE

DEAR MR. CHAIRMAN: This letter is written to you as Chairman of the Committee on the Judiciary. It is written in response to a number of earlier inquiries from members of your Committee concerning S. 1742, a proposal which would withdraw jurisdiction from the Supreme Court to consider "any case arising out of any State statute, ordinance, rule, [or] regulation . . . which relates to voluntary prayers in public schools and public buildings." A second provision of the bill would withdraw the jurisdiction of the district courts over any case in which the Supreme Court has been deprived of jurisdiction. This bill raises fundamental and difficult questions regarding the role of the Supreme Court in our constitutional system, as well as the power of Congress to define and circumscribe that role. The issues involved have been the subject of intense scholarly debate, and prominent constitutional scholars have differed as to the extent of congressional power to limit Supreme Court jurisdiction.

This is perhaps to be expected since the question of congressional power over the appellate jurisdiction of the Supreme Court implicates in a basic way the

13

relations between Congress and the Supreme Court, two co-equal branches of government. Relations between the different branches in our tripartite system are generally governed by the doctrine of separation of powers. Neither the Constitution nor the decisions of the Supreme Court have attempted to define the precise contours of this doctrine. As two astute students of our constitutional system have noted:

> The accommodations among the three branches of government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory.

Frankfurter & Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts, A Study in Separation of Powers,* 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original).

The doctrine of separation of powers touches fundamentally on how the Nation is governed, and, as the Supreme Court noted last Term in a separation of powers case, "it is doubtless both futile and perhaps dangerous to find any epigrammatical explanation of how this country has been governed." *Dames & Moore* v. *Regan,* 453 U.S. 654, 660 (1981). In this area more than any other we must heed Justice Holmes' wise admonition that "[t]he great ordinances of the Constitution do not establish and divide fields of black and white." *Springer* v. *Philippine Islands,* 277 U.S. 189, 209 (1928) (dissenting opinion).

There is no doubt that Congress possesses some power to regulate the appellate jurisdiction of the Supreme Court. The language of the Constitution authorizes Supreme Court appellate jurisdiction over enumerated types of cases "with such Exceptions, and under such Regulations as the Congress shall make." U.S. Const. Art. III. The Supreme Court has upheld the congressional exercise of power under this clause, even beyond widely accepted "housekeeping" matters such as time limits on the filing of appeals and minimum jurisdictional amounts in controversy. *See Ex parte McCardle,* 74 U.S. (7 Wall.) 506 (1869).

Congress may not, however, consistent with the Constitution, make "exceptions" to Supreme Court jurisdiction which would intrude upon the core functions of the Supreme Court as an independent and equal branch in our system of separation of powers.

In determining whether a given exception would intrude upon the core functions of the Supreme Court, it is necessary to consider a number of factors, such as whether the exception covers constitutional or nonconstitutional questions, the extent to which the subject is one which by its nature requires uniformity or permits diversity among the different states and different parts of the country, the extent to which Supreme Court review is necessary to ensure the supremacy of federal law, and whether other forums or remedies have been left in place so that the intrusion can properly be characterized as an exception.

Concluding that Congress may not intrude upon the core functions of the Supreme Court is not to suggest that the Supreme Court and the inferior federal

courts have not occasionally exceeded the properly restrained judicial role envisaged by the Framers of our Constitution. Nor does such a conclusion imply an endorsement of the soundness of some of the judicial decisions which have given rise to various of the legislative proposals now before Congress. The Department of Justice will continue, through its litigating efforts, to urge the courts not to intrude into areas that properly belong to the state legislatures and to Congress. The remedy for judicial overreaching, however, is not to restrict the Supreme Court's jurisdiction over those cases which are central to the core functions of the Court in our system of government. This remedy would in many ways create problems equal to or more severe than those which the measure seeks to rectify.[1]

With respect to other pending legislation, the Department of Justice has concluded that Congress may, within constraints imposed by provisions of the Constitution other than Article III, limit the jurisdiction or remedial authority of the inferior federal courts. See Letter from William French Smith, Attorney General, to Chairman Rodino, House Comm. on the Judiciary, concerning S. 951 (May 6, 1982). The question of congressional power over lower federal courts is quite different from the question of congressional power over Supreme Court jurisdiction, and the two issues should not be confused.

# I.

Proponents of congressional constitutional authority to limit the Supreme Court's entire appellate jurisdiction have contended that such authority exists under the Exceptions Clause of Article III of the Constitution. Article III provides, in pertinent part:

> Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. . . .

> Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under

---

[1] The Department of Justice, in previous Administrations, has consistently opposed proposals to restrict Supreme Court jurisdiction See *Limitation of Appellate Jurisdiction of the United States Supreme Court· Hearings on S. 2646 Before the Subcomm To Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Sen Comm on the Judiciary,* 85th Cong , 2d Sess. 573–74, Pt 2 (1958) (statement of Attorney General Rogers) ("[f]ull and unimpaired appellate jurisdiction in the Supreme Court is fundamental under our system of government"); Memorandum for the Attorney General from Assistant Attorney General Malcolm R Wilkey, OLC (Feb 25, 1958) (bills to limit Supreme Court jurisdiction are constitutional but bad policy); Memorandum for the Deputy Attorney General from Assistant Attorney General Tompkins, Internal Security Div. (Feb 14, 1958) (unconstitutional), Letter to Sen. James O Eastland, Chairman, Senate Comm. on the Judiciary, from Deputy Attorney General Richard Kleindienst (Sept 4, 1969) (not clearly distinguishing constitutional and policy objections), Memorandum for the Attorney General from Assistant Attorney General William H Rehnquist (Sept 16, 1969) (not clearly distinguishing constitutional and policy objections), Letter from Assistant Attorney General Alan Parker to Rep Peter Rodino, Chairman, House Comm on the Judiciary (June 19, 1980) (unconstitutional); *Prayer in Public Schools and Buildings—Federal Court Jurisdiction: Hearings on S 450 Before the Subcomm on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 11 (1980) (testimony of John M. Harmon, Assistant Attorney General, OLC) (unconstitutional).

15

their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, *with such Exceptions, and under such Regulations as the Congress shall make.* (Emphasis added.)

The language of the Exceptions Clause, italicized above, does not support the conclusion that Congress possesses plenary authority to remove the Supreme Court's appellate jurisdiction over all cases within that jurisdiction. The concept of an "exception" was understood by the Framers, as it is defined today, as meaning an exclusion from a general rule or law. An "exception" cannot, as a matter of plain language, be read so broadly as to swallow the general rule in terms of which it is defined.

The Constitution, unlike a statute, is not drafted with specific situations in mind. Designed as the fundamental charter of our political system, its most important provisions are phrased in broad and general terms. As eloquently expressed by Justice Holmes in *Missouri* v. *Holland,* 252 U.S. 416, 433 (1920):

> [W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago.

For example, a literal interpretation of Article III as a whole would seem to mandate that Congress vest the full judicial power of the United States either in the Supreme Court or in an inferior federal court. Under such an interpretation, Congress could make "exceptions" to the Supreme Court's appellate jurisdiction only if it vested the jurisdiction at issue either in an inferior federal court or in the Supreme Court's original jurisdiction. This interpretation, which would require the conclusion that any measure which entirely ousted the federal courts from exercising any portion of the judicial power of the United States and vested that

16

authority in state courts would be unconstitutional, is rejected by all authorities today.[2]

The Constitution contains a number of other pronouncements which, although seemingly unambiguous and absolute, have necessarily been interpreted as limited in their applicability. *See, e.g., Home Building & Loan Ass'n* v. *Blaisdell,* 290 U.S. 398 (1934) (Contract Clause); *Everson* v. *Board of Education,* 330 U.S. 1 (1947) (Establishment Clause); *Reynolds* v. *United States,* 98 U.S. 145 (1878) (Free Exercise Clause); *Brandenburg* v. *Ohio,* 395 U.S. 444 (1969) *(per curiam)* (Free Speech Clause). The Supreme Court has also recognized that even when a statute is otherwise within a power granted to Congress by the Constitution, extrinsic limitations on congressional power contained in the Bill of Rights or elsewhere may nevertheless render the statute unconstitutional. *See, e.g., National League of Cities* v. *Usery,* 426 U.S. 833 (1976) (limitations on Commerce Clause); *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 421 (1819) (limitations on Necessary and Proper Clause).

In light of these principles of constitutional interpretation, the Exceptions Clause may not be analyzed in a vacuum but must be understood in terms of Article III as a whole, as evidenced by the history of its framing and ratification, its place in the system of separation of powers embodied in the structure of the Constitution, and its consistency with external limitations on congressional power implicit in the Constitution and contained in the Bill of Rights. The construction of the Exceptions Clause that is most consistent both with the plain language of the clause and with other evidence of its meaning is that Congress can limit the Supreme Court's appellate jurisdiction only up to the point where it impairs the Court's core functions in the constitutional scheme.

## II.

The events at the Constitutional Convention support a construction of the Exceptions Clause that would preclude Congress from interfering with the Supreme Court's core functions. The Framers agreed without dissent on the necessity of a Supreme Court to secure national rights and the uniformity of judgments. The Resolves which were agreed to by the Convention and given to the Committee of Detail provided, simply, that "the jurisdiction [of the Supreme Court] shall extend to all cases arising under the Natl. laws: And to such other questions as may involve the Natl. peace & harmony." 2 M. Farrand, *Records of the Federal Convention of 1787,* at 46 (rev. ed. 1937). No mention was made of any congressional power to make exceptions to the Court's jurisdiction. The Committee of Detail, charged with drafting a provision to implement these Resolves, proposed the language of the Exceptions Clause. It seems unlikely that

---

[2] *Marbury* v *Madison,* 5 U.S. (1 Cranch) 137 (1803), established that Congress has no authority to enlarge the Supreme Court's original jurisdiction by creating "exceptions" to its appellate jurisdiction In *Martin* v *Hunter's Lessee,* 14 U.S (1 Wheat ) 304, 330–31 (1816), Justice Story argued that, if Congress creates any inferior federal courts, it must confer on them the full federal jurisdiction. This view, however, has never since been accepted by a majority of the Supreme Court

the Committee of Detail could have deviated so dramatically from the Convention's Resolves as to have given Congress the authority to interfere with the Supreme Court's core functions without considerably more attention to the subject at the Convention.

This interference is strengthened by the events surrounding the adoption of the Judicial Article by the full Convention. In determining the scope of the Court's jurisdiction, the Convention agreed to provisions expressly confirming that the jurisdiction included cases arising under the Constitution and treaties; but it rejected, by a 6 to 2 vote, a resolution providing that, except in the narrow class of cases under the Court's original jurisdiction, "the judicial power shall be exercised in such manner as the Legislature shall direct."[3] The Convention thus rejected a clear statement of plenary congressional power over the Court's appellate jurisdiction. Nevertheless, on the same day—*without any recorded debate or explanation*—the Framers adopted the Exceptions and Regulations language now contained in Article III. In light of the value placed on the Supreme Court's appellate jurisdiction, as evidenced by the other actions of the Convention, it seems highly unlikely that the Framers would have agreed, without the slightest hint of controversy, to a provision that would authorize Congress to interfere with the Court's core constitutional functions.

There are additional reasons why the lack of controversy surrounding the adoption of the Exceptions Clause supports the inference that no power to intrude on the Court's core functions was intended. First, the historical materials show the great importance which the Framers attached to these functions. They envisaged that the Supreme Court was a necessary part of the constitutional scheme and believed that the Court would review state and federal laws for consistency with the Constitution.[4] These sentiments were echoed by the authors of *The Federalist Papers* (J. Cooke ed. 1961), a work which is justly regarded as an important guide to the meaning of the Constitution.[5] In light of this explicit recognition by the Founding Fathers of the Court's vital role in the constitutional scheme, it seems unlikely that they would have adopted, without controversy, a provision which would effectively authorize Congress to eliminate the Court's core functions.

A second reason for inferring a more limited construction of the Exceptions Clause from the lack of discussion at the Convention concerns the compromise agreed to by the Framers regarding the establishment of inferior federal courts. While the necessity of a Supreme Court was accepted without significant dissent among the Framers, there was vigorous disagreement over whether inferior federal courts should be provided. The Convention first approved a provision calling for mandatory inferior federal courts, then struck this provision by a divided vote, and finally determined to leave to Congress the question whether to

---

[3] 2 M. Farrand, Records of the Federal Convention of 1787

[4] *See, e.g.,* 1 M Farrand, *supra,* at 124; 2 M. Farrand, *supra,* at 589

[5] *See, e.g* , The Federalist No. 39, at 256 (J Madison) (J. Cooke ed. 1961) (Supreme Court is "clearly essential to prevent an appeal to the sword and a dissolution of the compact"); *id* No. 80 (A Hamilton), *id.* No 82 (A. Hamilton)

18

establish inferior federal courts. The Supreme Court was viewed as a necessary part of the constitutional structure and was established by the Constitution itself; Congress was given no control over whether the Court would be created. The inferior federal courts, however, were viewed as an optional part of the government and were authorized but not established by the Constitution. The decision whether to create them was given to Congress. This distinction, and the role explicitly assigned to Congress with respect to the inferior federal courts, implies that the powers of Congress were to be quite different with respect to the Supreme Court and the inferior federal courts.

If the Exceptions Clause authorized Congress to eliminate the Supreme Court's appellate jurisdiction, thus limiting it to the exercise of original jurisdiction, the power of Congress over the Supreme Court would be virtually indistinguishable from its power over inferior federal courts. Just as Congress could decline to create inferior federal courts, it could, in the guise of creating "exceptions" to the Supreme Court's appellate jurisdiction, deny the Supreme Court the vast majority of the judicial powers which the Framers insisted "shall be vested" in the federal judiciary. Congress could not eliminate the Supreme Court, but it could reduce it to a position of virtual impotence with only its limited original jurisdiction remaining. Such an interpretation cannot be squared with the stark difference in treatment which the Framers accorded to the Supreme Court and the inferior federal courts. Given the intensity of the debate regarding inferior federal courts, and the compromise arrived at by the Framers, it seems highly unlikely that the Convention would have adopted without comment a provision which, for most practical purposes, would place the Supreme Court and the inferior federal courts in the same position vis-a-vis Congress.

A third reason to infer a limited construction of the Exceptions Clause from the lack of debate accompanying its adoption is found in the theory of separation of powers which formed the conceptual foundation for the system of government adopted by the Convention. The Framers intended that each of the three branches of government would operate largely independently of the others and would check and balance the other branches. The purpose of this approach was to ensure that governmental power did not become concentrated in the hands of any one individual or group, and thereby to avoid the danger of tyranny which the Framers believed inevitably accompanied unchecked governmental power. Indeed, it is not an exaggeration to say that the single greatest fear of the Founding Fathers was tyranny, and that concentration of power was, in their minds, "the very definition of tyranny."[6]

Essential to the principle of separation of powers was the proposition that no one branch of government should have the power to eliminate the fundamental constitutional role of either of the other branches. As Madison stated in The Federalist No. 51, at 349 (J. Cooke ed. 1961):

> [T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who

---

[6] The Federalist No. 47, at 324 (J Madison) (J. Cooke ed 1961)

administer each department, the necessary constitutional means and personal motives, to resist encroachments, of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack.

This basic principle of the Constitution—that each branch must be given the necessary means to defend itself against the encroachments of the two other branches—has special relevance in the context of *legislative* attempts to restrict *judicial* authority. The Framers "applaud[ed] the wisdom of those states who have committed the judicial power in the last resort, not to a part of the legislature, but to distinct and independent bodies of men." The Federalist No. 81, at 544 (A. Hamilton) (J. Cooke ed. 1961). They believed that, by the inherent nature of their power, the legislature would tend to be the strongest and the judiciary the weakest of the branches. This insight is reflected in the very structure of the Constitution: the provisions governing the legislature are placed first, in Article I; those establishing and governing the Judicial Branch are in the third position, in Article III. Madison recognized the great inherent power of the Legislative Branch in The Federalist No. 48. Drawing extensively from Jefferson's *Notes on the State of Virginia,* Madison concluded that in a representative republic "[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex." The Federalist No. 48, at 333 (J. Cooke ed. 1961). *See also* The Federalist No. 51 (J. Madison) (J. Cooke ed. 1961).

It was in no sense a derogation on the concept of governance responsive to popular will that the Founding Fathers desired checks on the power of the legislature they were creating. The Acts of Parliament as well as those of the King formed the litany of grievances which produced the Revolution. The Founding Fathers believed in the voice of the people and their elected representatives and placed substantial power in the Legislature. At the same time, however, they were acutely sensitive to the rights of individuals and minorities. Most of them had first-hand experience with persecution. The idea of a written Constitution was precisely to place a check on the popular will and, in large part, to restrain the most powerful branch. They crafted a representative republic with restraints on the legislature. "An *elective despotism* was not the government we fought for. . . ." The Federalist No. 48, at 335 (J. Madison) (J. Cooke ed. 1961), quoting Jefferson's *Notes on the State of Virginia* (emphasis in original).

The Supreme Court was viewed as a part of this restraint, but, nonetheless, inherently as the least dangerous branch. Hamilton, in a famous passage from The Federalist No. 78, at 522–23 (J. Cooke ed. 1961) eloquently testified to the inherent weakness of the Judicial Branch:

> Whoever attentively considers the different departments of power must perceive, that in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the constitution; because it will be least in a capacity to annoy

or injure them. The executive not only dispenses the honors but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary on the contrary has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

As a consequence of this view, Hamilton believed that it was necessary for the judiciary to remain "truly distinct from both the legislative and the executive. For I agree that 'there is no liberty, if the power of judging be not separated from the legislative and executive powers.'" *Id.* at 523, quoting Montesquieu's Spirit of Laws. Thus, he concluded: "The complete independence of the courts of justice is peculiarly essential in a limited constitution." The Federalist No. 78, at 524 (J. Cooke ed. 1961).

It was in recognition of the inherent weakness of the judiciary, particularly as contrasted with the inherent power of the legislature, that the Framers determined to give special protections to the judiciary not enjoyed by officials of the other branches. Federal judges were given lifetime positions during good behavior, and were protected against diminution of salary while in office. The purpose of these provisions was largely to provide the judiciary, as the weakest branch, with the necessary tools for self-protection against the encroachments of the other branches.

The notion that the Exceptions Clause grants Congress plenary authority over the Supreme Court's appellate jurisdiction cannot easily be reconciled with these principles of separation of powers. If Congress had such authority, it could reduce the Supreme Court to a position of impotence in the tripartite constitutional scheme. The Court could be deprived of its ability to protect its core constitutional functions against the power of Congress. The salary and tenure protections so carefully crafted in Article III could be rendered virtually meaningless in light of the power of the Congress simply to eliminate appellate jurisdiction altogether, or in those areas where the Court's decisions displeased the legislature. It is significant that while the Framers did not focus on the Exceptions Clause, they did point to the impeachment power as "a complete security" against risks of "a series of deliberate usurpations on the authority of the legislature." The Federalist No. 81, at 546 (A. Hamilton) (J. Cooke ed. 1961).

In light of these basic considerations, it seems unlikely that the Framers intended the Exceptions Clause to empower Congress to impair the Supreme Court's core functions in the constitutional scheme. Even if some of the Framers could have intended this, it is improbable that the Exceptions Clause could have been approved by the Convention without debate or controversy, or indeed without any explicit statement by anyone associated with the framing or ratifica-

21

tion of the Constitution that such a deviation from the carefully crafted separation of powers mechanisms provided elsewhere in the Constitution was intended. Nor does it seem likely that the Convention would have developed the Exceptions Clause as a check on the Supreme Court in such a manner that an exercise of power under the Clause to remove Supreme Court appellate jurisdiction would not return authority to Congress, but vest it in the state courts instead. Hamilton regarded even the possibility of multiple courts of final jurisdiction as unacceptable. The Federalist No. 80, at 535 (J. Cooke ed. 1961).

> The mere necessity of uniformity in the interpretation of the national laws, decides the question. Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed.

Thus, unless there is sound and compelling evidence of a contrary interpretation in the decisions of the Supreme Court, or in the long-accepted historical practices regarding congressional control of Supreme Court jurisdiction, it must be concluded that the Exceptions Clause does not authorize Congress to interfere with the Court's core functions in our constitutional system.

## III.

An examination of the Supreme Court's cases does not require any different interpretation. The Supreme Court has provided only inconclusive guidance on the meaning of the Exceptions Clause. In *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 347–48 (1816), the Court noted "the importance, and even necessity of uniformity of decisions throughout the whole United States, upon all subjects within the purview of the constitution." In the absence of the Supreme Court, Justice Story observed, "the laws, the treaties, and the constitution of the United States would be different, in different states. . . . The public mischiefs that would attend such a state of things would be truly deplorable; and it cannot be believed, that they could have escaped the enlightened convention which formed the constitution. . . . [T]he appellate jurisdiction must continue to be the only adequate remedy for such evils." *Id.* at 348. Similar statements are found in the opinions of Chief Justice Marshall, *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 415 (1821), and Chief Justice Taney, *Ableman* v. *Booth*, 62 U.S. (21 How.) 506, 517–18 (1858).[7] Although these cases do not squarely address the question whether Congress could constitutionally deprive the Court of its core functions, the Court's language seems strong enough to cast considerable doubt, at least by implication, on the power of Congress to eliminate Supreme Court jurisdiction

---

[7] *Cf.* the famous statement of Justice Holmes:
   I do not think the United States would come to an end if we lost our power to declare an Act of Congress void I do think the Union would be imperiled if we could not make that declaration as to the laws of the several States
O. Holmes, Collected Legal Papers 295–96 (1920).

over cases in which a final, uniform, and supreme voice is necessary in the guise of creating "exceptions" to that jurisdiction. In the words of Chief Justice Taney, the exercise of such a power would withdraw authority which is "essential . . . to [the] very existence [of the Federal] Government [and] essential to secure the independence and supremacy of [that] Government." *Id.*

The Supreme Court has, in a number of early cases, referred to the power of Congress over its appellate jurisdiction as being quite broad. For example, in *Barry v. Mercein,* 46 U.S. (5 How.) 103, 119 (1847), the Court stated that "[b]y the constitution of the United States, the Supreme Court possesses no appellate power in any case, unless conferred upon it by act of Congress; nor can it, when conferred be exercised in any other form, or by any other mode of proceeding than that which the law prescribes." *See also The Francis Wright,* 105 U.S. 381, 386 (1881); *Daniels* v. *Railroad Co.,* 70 U.S. (3 Wall.) 250, 254 (1865); *Durousseau* v. *United States,* 10 U.S. (6 Cranch) 307, 313–14 (1810); *United States* v. *More,* 7 U.S. (3 Cranch) 159 (1805); *Wiscart* v. *Dauchy,* 3 U.S. (3 Dall.) 321, 327 (1796). However, every one of these statements is *dictum;* the Court has never held that Congress has the power entirely to preclude the Court from exercising its core functions. It may also be doubted whether these broad statements are intended to cover cases in which such an extraordinary congressional power was exercised. They may instead be designed to recognize a broad power which, like the Commerce Clause, is limited by other provisions of the Constitution and by the structure of the document as a whole.

Proponents of the "plenary power" thesis rely most heavily on the only Supreme Court decision which could be characterized as upholding a power of Congress to divest the Court of jurisdiction over a class of constitutional cases: *Ex parte McCardle,* 74 U.S. (7 Wall.) 506 (1869). At issue in that case was the constitutionality of an 1868 statute repealing a provision enacted the previous year which had authorized appeals to the Supreme Court from denials of habeas corpus relief by a circuit court. In a brief opinion which did not discuss the scope or implications of the Exceptions Clause, the Court upheld Congress' withdrawal in 1868 of jurisdiction under the 1867 law, stating that "the power to make exceptions to the appellate jurisdiction of this court is given by express words." *Id.* at 514. Despite this broad language, the Court suggested that the withdrawal of jurisdiction provided by the 1867 law did not deprive the Court of jurisdiction over habeas corpus cases that had been conferred by § 14 of the Judiciary Act of 1789 (1 Stat. 81). "Counsel seem to have supposed, if effect be given to the repealing act in question, that the whole appellate power of the court, in cases of *habeas corpus,* is denied. But this is an error." 74 U.S. (7 Wall.) at 515.

The Court's *dictum* regarding alternative procedures for Supreme Court review of habeas corpus cases was converted into a holding several months later in *Ex parte Yerger,* 75 U.S. (8 Wall.) 85 (1869). The petitioner in that case had invoked the Court's jurisdiction under the Judiciary Act of 1789, ch. 20, 1 Stat. 73. In holding that it had jurisdiction, the Court in *Yerger* made it clear that the 1868 legislation considered in *McCardle* was limited to appeals taken under the 1867 act and upheld the petitioner's right to Supreme Court review under the proper

23

jurisdictional statute. The Court noted that the 1868 act did "not purport to touch the appellate jurisdiction conferred by the Constitution. . . ." *Id.* at 105. In doing so, the Court observed that any total restriction on the power to hear habeas corpus cases would "seriously hinder the establishment of that uniformity in deciding upon questions of personal rights which can only be attained through appellate jurisdiction. . . ." *Id.* at 103. Thus, within months of the *McCardle* decision, the Court made it clear that *McCardle* did not decide the question of Congress' power to deprive it of all authority to hear constitutional claims in habeas corpus cases. For this reason, while the *Yerger* Court acknowledged that the Court's jurisdiction as given by the Constitution "is . . . subject to exception and regulation by Congress," *id.* at 102, neither *McCardle,* nor *Yerger,* nor any other case, constitutes an authoritative statement that Congress could deprive the Court of its core functions.

## IV.

Finally, the historical record regarding the authority actually asserted by Congress to control the Court's appellate jurisdiction supports, on balance, the construction that the Exceptions Clause does not authorize Congress to interfere with the Court's core functions. It is indeed true that Congress did not in the First Judiciary Act explicitly authorize the Supreme Court to exercise the full range of appellate jurisdiction established by Article III. Perhaps the most prominent category of cases in which the Court was not granted statutory jurisdiction was federal criminal cases, which were not explicitly brought within the Court's appellate jurisdiction until 1889. Although Supreme Court review over these cases may have been available in special circumstances, it is probably true that most federal criminal cases were not reviewable by the Supreme Court during this period under the terms of the applicable legislation. The Judiciary Act also failed to grant the Supreme Court appellate jurisdiction over state court decisions striking down state laws as being inconsistent with the federal Constitution, or upholding federal statutes against constitutional attack.

The failure of Congress in the First Judiciary Act to provide the Court with the full appellate jurisdiction authorized under Article III does not undermine the conclusion that Congress cannot interfere with the Supreme Court's core functions, for several reasons. First, while Congress did omit certain specific categories of cases from the appellate jurisdiction provisions of the First Judiciary Act, it is noteworthy that the first Congress, containing among its members many delegates to the Constitutional Convention, recognized the Court's appellate jurisdiction over an extremely broad range of constitutional cases. Most significantly, the Court was given authority under § 25 of the Judiciary Act (1 Stat. 85) to review decisions of state courts striking down federal statutes or upholding state statutes against constitutional attack. That authority was conferred despite the intense controversy which it sparked among the states—controversy which resulted in state resistance to Supreme Court judgments and in attempts in Congress, foreshadowing the current attempts to limit the Court's jurisdiction, to

24

repeal § 25 of the Judiciary Act. The fact that the Judiciary Act did not explicitly recognize jurisdiction over state court decisions upholding the validity of federal laws or striking down state laws, or over federal criminal cases, does not undercut the position that the Court cannot be divested of its ability to fulfill its essential responsibility under the Constitution. The supremacy of federal law, guaranteed by the Supreme Court, would not be seriously threatened by state court decisions upholding federal laws or striking down state laws on federal constitutional grounds.

Second, the history of Supreme Court appellate review has confirmed the importance of its core functions. To the extent that any inferences can be drawn from the failure of the First Judiciary Act explicitly to recognize the full range of the Supreme Court's appellate jurisdiction over constitutional cases, those inferences are subject to refutation by later events. The Supreme Court now has appellate jurisdiction over all federal cases. Each of the areas of incomplete jurisdiction has long since been fulfilled. The vast majority of constitutional decisions which are on the books today, and which affect our national life in many and important ways, have been rendered by the Court under a statutory regime which included such broad appellate jurisdiction. As Justice Frankfurter said in another context, "the content of the three authorities of government is not to be derived from an abstract analysis. . . . It is an inadmissibly narrow conception of American constitutional law to confine it to the words of the Constitution and to disregard the gloss which life has written upon them." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 610 (1952) (concurring opinion). The gloss which life has written on the Supreme Court's jurisdiction is one which protects the essential role of the Court in the constitutional plan.

## V.

As noted at the outset, Congress has substantial authority over the jurisdiction and power of the inferior federal courts. It also is given the power under Article III to regulate the Supreme Court's appellate jurisdiction in circumstances which do not threaten the core functions of the Court as an independent branch in our system of separation of powers. Congress may, for example, specify procedures for obtaining Supreme Court review and impose other restraints on the Court. But the question of the limits of Congress' authority under the Exceptions Clause is an extraordinarily difficult one. Thoughtful and respected authorities have come to conclusions which differ.

The legislative process itself is often important in assessing not only the meaning but also the constitutionality of congressional enactments. The Court has stated that it must have "due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." *Rostker* v. *Goldberg,* 453 U.S. 57, 64 (1981).

If Congress considers the subject matter of S. 1742 it may wish to do so in light of the principles enunciated above and carefully weigh whether whatever action

is taken would intrude upon the essential functions of the Supreme Court as an independent branch of government in our system of separation of powers. As the Court has stated, "The customary deference accorded the judgments of Congress is certainly appropriate when . . . Congress specifically considered the question of the Act's constitutionality." 453 U.S. at 64.

Ultimately, it is for Congress to determine what laws to enact and for the Executive Branch to "take Care that the Laws be faithfully executed." U.S. Const., Art. III, § 3. It is settled practice that the Department of Justice must and will defend Acts of Congress except in the rare case when the statute either infringes on the constitutional power of the Executive or when prior precedent overwhelmingly indicates that the statute is invalid. Accordingly, should the Department be called upon to defend the constitutionality of this bill before the courts, it responsibly could and would do so.

It is appropriate to note, however, that even if it were concluded that legislation in this area could be enacted consistent with the Constitution, the Department would have concerns as a policy matter about the withdrawal of a class of cases from the appellate jurisdiction of the Supreme Court. History counsels against depriving that Court of its general appellate jurisdiction over federal questions. Proposals of this kind have been advanced periodically, but have not been adopted since the Civil War. There are sound reasons that explain why Congress has exercised restraint in this area and not tested the limits of constitutional authority under the Exceptions Clause.

The integrity of our system of federal law depends upon a single court of last resort having a final say on the resolution of federal questions. The ultimate result of depriving the Supreme Court of jurisdiction over a class of cases would be that federal law would vary in its impact among the inferior courts. State courts could reach disparate conclusions on identical questions of federal law, and the Supreme Court would not be able to resolve the inevitable conflicts. There would also exist no guarantee through Supreme Court review that state courts accord appropriate supremacy to federal law when it conflicts with state enactments.

Sincerely,
WILLIAM FRENCH SMITH

26